1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

RICHARD BREES,

                          Plaintiff,

            v.

JEFFERSON COUNTY, a Political
Subdivision of the State of Washington;
JEFFERSON COUNTY SHERIFF'S
OFFICE, an agency of JEFFERSON
COUNTY; BRIAN POST, a Jefferson
County Sheriff's Deputy; BRIAN
ANDERSON, a Jefferson County
Sheriff's Deputy; ADAM NEWMAN, a
Jefferson County Sheriff's Deputy;
WILLIAM THAYER,

                          Defendants.

CASE NO. C07-5000BHS

ORDER GRANTING IN PART
AND DENYING IN PART
COUNTY DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT

        This matter comes before the Court on County Defendants' Motion for Summary

Judgment (Dkt. 32). The Court has considered the pleadings filed in support of and in

opposition to the motion and the remainder of the file and hereby grants in part and denies

in part the motion for the reasons stated herein.

## I. FACTUAL BACKGROUND

        Plaintiff Richard Brees and Defendant William Thayer live in the same

neighborhood. After Mr. Brees began construction of his home, the otherwise cordial

relationship between the neighbors became tense and characterized by Mr. Thayer's

1  complaints about Mr. Brees to the Jefferson County Sheriff's Office. This case centers on

2  those complaints and the response of the Jefferson County Sheriff's Office to the

3  complaints and to Mr. Brees's political activities. Unless otherwise indicated, the

4  following facts are undisputed or presented in the light most favorable to Plaintiff, the

5  nonmoving party:

6       In or around September of 2005, Mr. Thayer placed cones on the roadway in front

7  of his house, Embody Road, allegedly in order to deter Mr. Brees from speeding in the

8  neighborhood. *Id.* at 4. At the time, the posted speed limit on Embody Road was fifteen

9  miles per hour. Dkt. 39-2, Exh. A at 9. Mr. Brees contacted the Jefferson County Public

10 Works Department, which began to monitor speeding on Embody Road. *Id.* at 7-8.

11      Mr. Brees was contacted by the Jefferson County Police Department regarding

12 allegations that he was speeding on Embody Road. *Id.* at 11-12. Mr. Brees spoke with

13 contractors working on his house to ensure that they were not the cause of the speeding

14 complaint and considered the matter resolved. *Id.* at 12. At some point, the speed limit on

15 Embody Road was changed to twenty miles per hour. *Id.* at 9.

16      On a separate occasion, Mr. Brees was contacted by a Jefferson County Deputy

17 who was at Mr. Brees's house while Mr. Brees was away. *Id.* at 13. The reason for the

18 visit was apparently the placement of a truck driven by a contractor working on Mr.

19 Brees's house. *Id.* Mr. Brees did not believe that the truck was causing an obstruction but

20 did arrange to have the truck moved. *Id.*

21 **A.   THE ARREST**

22      On March 16, 2006, Plaintiff Richard Brees was driving on Embody Road in

23 Jefferson County, Washington. Dkt. 11 at 3. Mr. Brees's wife was a passenger in the car.

24 *Id.* The Breeses were on the way home from Mr. Brees's office and were planning to have

25 a family dinner to celebrate the news that their daughter was pregnant.

26      Upon arriving in the neighborhood, Mr. and Ms. Brees found Mr. Thayer, who was

27 allegedly the source of complaints regarding Mr. Brees driving in excessive speeds on

28

ORDER - 2

Embody Road, standing in the middle of the road holding a shovel. Dkt. 39-2, Exh. A at 17. Mr. Thayer was blocking the road, forcing Mr. Brees to turn left to avoid him. *Id.* at 20. As Mr. Brees passed Mr. Thayer in the car, Mr. Thayer held up a shovel and yelled at Mr. Brees to slow down. *Id.* at 21. Mr. Brees was concerned because his daughter was following in the car behind him. *Id.* at 22.

Mr. Brees exited the car to talk to Mr. Thayer and walked around the rear of the vehicle. *Id.* at 25. Mr. Brees and Mr. Thayer argued, and Mr. Thayer threatened Mr. Brees with the shovel, saying, "I will wrap this shovel around your f—ing head." *Id.* Mr. Brees backed away as Mr. Thayer advanced and told Mr. Thayer to put the shovel down. *Id.* Mr. Thayer then threw the shovel across Mr. Brees's car and punched Mr. Brees in his left eye. *Id.* at 26, 28. Ms. Brees did not see Mr. Thayer throw the shovel or punch Mr. Brees. Dkt. 39-5, Exh. D at 5. In this struggle, Mr. Brees landed in the driver's seat of his car. Mr. Brees then "pushed" Mr. Thayer with his foot in an attempt to resist Mr. Thayer. Dkt. 39-2, Exh. A at 27.

Mr. Brees began looking around his car for his keys. *Id.* at 32. He then heard thumping from the passenger side of the vehicle and saw Mr. Thayer's open hand on the passenger window. *Id.* at 33. Mr. Thayer was banging on the window. Dkt. 39-5, Exh. D at 5. Mr. Brees again exited the vehicle, and Mr. Thayer ran to his house. Dkt. 39-2, Exh. A at 33. Mr. Brees drove home and was afraid that Mr. Thayer was planning to retrieve a gun and follow him to the house. *Id.* at 33.

Mr. Thayer returned to his home, and Joyce Arthur, Mr. Thayer's girlfriend, contacted the Jefferson County Sheriff's Office and reported that Mr. Brees had assaulted Mr. Thayer. Dkt. 11 at 3.

Mr. Brees similarly went home and called the Jefferson County Sheriff's Office to report that he had been assaulted by Mr. Thayer. *Id*.; Dkt. 39-2, Exh. A at 37. Mr. Brees gave his name and address, and then the call was disconnected. Dkt. 39-2, Exh. A at 38. Once at home, Ms. Brees noticed that her husband's face was bruised. Dkt. 39-5, Exh. D

1  at 7. Mr. Brees heard his dog barking and assumed that the police were responding to his

2  call. Dkt. 39-2, Exh. A at 40.

3      Defendant Brian Post and other deputies responded to the reports. The deputies

4  first interviewed Mr. Thayer. Dkt. 41, Exh. 1 at 8. Mr. Thayer told the deputies that Mr.

5  Brees had struck and kicked him and that, after retreating to his property, Mr. Brees

6  pulled a piece of pipe out of the ground, threatened to strike Mr. Thayer with it, and

7  struck a section of Mr. Thayer's gate before driving off. *Id.* at 8. Once on the scene, the

8  deputies were informed that Mr. Brees had also reported an assault. *Id.* at 10. The

9  deputies therefore left Mr. Thayer to speak with Mr. Brees. *Id.*

10     The parties offer different versions of the deputies' contact with Mr. Brees.

11 According to Mr. Brees, the deputies had their hands on their guns while questioning him.

12 Dkt. 39-2, Exh. A at 41. During the questioning, the deputies were laughing at Mr. Brees

13 and would not let him tell his side of the story. Dkt. 39-5, Exh. D at 10. The deputies

14 asked Mr. Brees more than once why he exited his vehicle. Dkt. 39-2, Exh. A at 41. Mr.

15 Brees then put his hands up and said, "I can see where this is going." *Id.* Mr. Brees did

16 not think that the deputies would hear his side of the story and went to go inside of his

17 house and call his attorney. *Id.* at 41-42. The deputies then "grabbed" him, "threw" him

18 against the car, and arrested him. *Id.* at 42.

19     According to Deputy Post, Mr. Brees told Deputy Post that Mr. Thayer had struck

20 him on the chin. Dkt. 41, Exh. 1 at 10. Deputy Post did not see any marks on Mr. Brees.

21 *Id.* Deputy Post contends that acceleration marks on the ground and a pipe lying next to

22 those marks corroborated Mr. Thayer's version of the events. *Id.* at 9. Deputy Post

23 characterized Mr. Brees's demeanor as angry and uncooperative. *Id.* at 10. Mr. Brees told

24 Deputy Post that the reason why he got out of the car the second time, instead of merely

25 driving away, was because he was "pissed." *Id.* at 11. During his exchange with the

26 deputies, Mr. Brees said, "Fine" and that he did not want Mr. Thayer to be charged with

27 anything and headed towards the house. *Id.* at 11. Deputy Post told Mr. Brees to stop and

28

told Deputy Anderson to arrest Mr. Brees. *Id.* at 11; Dkt. 39-7, Exh. F at 3. Mr. Brees told his wife not to speak to the deputies, and Ms. Brees refused to give her name or offer her version of the events. Dkt. 41, Exh. 1 at 11-12.

The deputies ultimately arrested Mr. Brees for assault and malicious mischief. Dkt. 11 at 4. While transporting Mr. Brees to jail, Deputy Newman noticed that Mr. Brees had a red mark above his eye. Dkt. 39-8, Exh. G at 3. Mr. Brees was acquitted of both charges. Dkt. 11 at 5.

**B.    THE SEARCH WARRANT**

In August of 2006, while the criminal charges against Mr. Brees were pending, Mr. Thayer complained to the Jefferson County Sheriff's Office that Mr. Brees was sending him threatening emails. Dkt. 11 at 5. Deputy Post called prosecuting attorney John Raymond to confirm that Mr. Thayer was scheduled to testify as the victim witness in Mr. Brees's upcoming criminal trial. Dkt. 41, Exh. 1 at 14. Mr. Raymond asked Deputy Post to obtain a search warrant and approved Deputy Post's affidavit. *Id.*

Deputy Post's work email is filtered and would not accept the forwarded email. Dkt. 39-6, Exh. E at 19. Deputy Post asked Joyce Arthur to forward the email to his personal email account. Dkt. 39-5, Exh. D at 19. Deputy Post did not want his personal email address listed on the affidavit presented to the judge who issued the search warrant. *Id.* The affidavit does not include the email address of the sender or recipient of the forwarded email. *Id.* Deputy Post also obtained a disk containing copies of the emails. Dkt. 39-9, Exh. H at 4.

As a result of Mr. Thayer's complaint, Deputy Post obtained a search warrant to search the Brees residence. Dkt. 11 at 5. The warrant was executed on August 19, 2006. Again, the parties offer differing accounts of the day on which the search warrant was executed. Mr. Brees contends that he heard his dog barking, went to see why, and saw that the police were at his residence. Dkt. 39-2, Exh. A at 56. Ms. Brees, who was in her nightgown, went to the laundry room to get a jacket. *Id.* at 57. The Breeses heard kicking

1   or beating on the door, and then Mr. Brees saw the door open. *Id.*; Dkt. 39-5, Exh. D at

2   15. The front door was dented by the deputies' entrance. Dkt. 39-2, Exh. A at 58; Dkt. 39-

3   5, Exh. D at 16. According to Mr. Brees, the deputies grabbed Mr. and Ms. Brees and

4   dragged them outside. Dkt. 39-2, Exh. A at 59. Ms. Brees contends that she was not

5   physically touched by the deputies. Dkt. 39-5, Exh. D at 17. The deputies had their guns

6   drawn while executing the search. Dkt. 39-2, Exh. A at 60; Dkt. 39-5, Exh. D at 15. The

7   deputies seized two computers and some computer cables. Dkt. 39-2, Exh. A at 60. One

8   of the deputies told Ms. Brees that they would be back, and Ms. Brees has suffered from

9   loss of sleep as a result. Dkt. 39-5, Exh. D at 19.

10      According to Deputy Post, the search warrant was executed by knocking on the

11  door and not through forced entry. Dkt. 41, Exh. 1 at 15. Deputy Post contends that Mr.

12  Brees was wearing ordinary attire and was not dressed in night clothing. *Id.* Deputy Post

13  does not recall Ms. Brees being grabbed. *Id.*

14  **C.   OTHER INCIDENTS**

15      On April 14, 2006, April Brees, who is Mr. Brees's daughter and is not a party to

16  this suit, was arrested for driving with a suspended license and accused of being

17  intoxicated. April Brees refused to talk to the arresting deputies without first talking to an

18  attorney or her father. Dkt. 11 at 4. While in jail, April Brees overheard one guard inform

19  another that April Brees was Mr. Brees's daughter. *Id.* April Brees was then harassed and

20  told by one guard to tell her father that the guard did not appreciate Mr. Brees's calls to

21  the Jefferson County Sheriff's Office. *Id.*

22      In a separate incident, Mr. Brees was pulled over on Larson Lake Road and

23  received a ticket for running a stop sign. Dkt. 39-2, Exh. A at 43. Mr. Brees contends that

24  he stopped at the stop sign. *Id.* The deputy issuing the ticket unsnapped his gun while

25  speaking to Mr. Brees and told Mr. Brees that he could be taken to jail for reckless

26  driving. *Id.* at 43.

27

28

ORDER - 6

1    On other occasions, Mr. Brees contends that deputies would follow him down his

2    driveway for no apparent reason. Dkt. 41, Exh. 2 at 28.

3    **D.    FIRST AMENDMENT ACTIVITIES**

4    Mr. Brees contends that County Defendants' actions towards him were in

5    retaliation for three activities protected under the First Amendment.

6    First, Mr. Brees previously sued Jefferson County, and the suit resulted in a

7    settlement. Dkt. 38 at 2. Mr. Brees contends that on the day of his arrest, Deputy Post

8    identified Mr. Brees as the person who had previously sued Jefferson County. Dkt. 41,

9    Exh. 3 at 21.

10    Second, Mr. Brees drafted a petition to establish a committee to oversee Jefferson

11    County. Dkt. 39-2, Exh. A at 48. Mr. Brees took the petition to a county commissioners

12    meeting. *Id.* The petition was apparently not well received and was regarded as a joke. *Id.*

13    After Mr. Brees "got wind" of this response, he lodged a complaint with the

14    commissioners regarding treatment of his petition. *Id.* at 50.

15    Finally, while awaiting trial on the assault and malicious mischief charges, Mr.

16    Brees sought election to the Jefferson County Sheriff's Office. *Id.* at 54. During the

17    campaign, Mr. Brees was contacted by Hyram Godsey, a former deputy of the Jefferson

18    County Sheriff's Office, who told him to be careful and that Deputy Post would kill him.

19    *Id.* at 64. According to Mr. Brees, deputies sat in the audience of candidate forums and

20    made obscene hand gestures while Mr. Brees spoke. Dkt. 41, Exh. 2 at 22.

21                        **II. PROCEDURAL BACKGROUND**

22    Mr. Brees brings claims for violation of his civil rights under the Fourteenth, First

23    (freedom of speech and access to the courts), and Fourth (freedom from illegal search and

24    seizure) Amendments, for malicious prosecution, and for false imprisonment. *Id.* at 6-7.

25    Deputies Brian Anderson and Adam Newman have been dismissed from this suit by

26    stipulation (Dkt. 20). Jefferson County, the Jefferson County Sheriff's Office, and Deputy

27

28

1  Post ("County Defendants") now move for summary judgment on all of Mr. Brees's

2  claims. Dkt. 32.

3                                    **III. DISCUSSION**

4  **A.      SUMMARY JUDGMENT STANDARD**

5          Summary judgment is proper only if the pleadings, depositions, answers to

6  interrogatories, and admissions on file, together with the affidavits, if any, show that there

7  is no genuine issue as to any material fact and the moving party is entitled to judgment as

8  a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a

9  matter of law when the nonmoving party fails to make a sufficient showing on an

10 essential element of a claim in the case on which the nonmoving party has the burden of

11 proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of

12 fact for trial where the record, taken as a whole, could not lead a rational trier of fact to

13 find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

14 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative

15 evidence, not simply "some metaphysical doubt."). *See also* Fed. R. Civ. P. 56(e).

16 Conversely, a genuine dispute over a material fact exists if there is sufficient evidence

17 supporting the claimed factual dispute, requiring a judge or jury to resolve the differing

18 versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W.*

19 *Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

20         The determination of the existence of a material fact is often a close question. The

21 Court must consider the substantive evidentiary burden that the nonmoving party must

22 meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477

23 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual

24 issues of controversy in favor of the nonmoving party only when the facts specifically

25 attested by that party contradict facts specifically attested by the moving party. The

26 nonmoving party may not merely state that it will discredit the moving party's evidence at

27 trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec.*

28

1  *Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*). Conclusory, nonspecific

2  statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan*

3  *v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

4  **B.    MOTIONS TO STRIKE**

5      In his response, Mr. Brees moves to strike exhibits offered by the County

6  Defendants in support of their motion. Dkt. 38 at 1-2. Mr. Brees contends that the

7  exhibits, deposition excerpts, must be stricken because the cover pages and court

8  reporter's certification have not been provided to the Court. Dkt. 38 at 1. In the reply,

9  County Defendants cured this omission. Mr. Brees's Motion to Strike is therefore denied.

10     In their reply, the County Defendants move to strike statements offered in support

11 of Mr. Brees's motion for summary judgment on the grounds that they constitute hearsay,

12 are speculative, or are not supported by personal knowledge.

13     County Defendants move to strike the statement, "The Jefferson County Sheriff

14 laughed off this proposal." Dkt. 40 at 3. This statement appears in Plaintiff's response.

15 This is a summation of Mr. Brees's deposition, in which Mr. Brees characterizes Mr.

16 Brasfield's response to Mr. Brees's petition to create an oversight committee. *See* Dkt.

17 39-2, Exh. A at 48-49 ("this is a joke, more or less was his attitude in the response"). To

18 the extent that this description of Mr. Brasfield's response may quote a statement, it does

19 not seek to establish the truth of the matter asserted and does not constitute hearsay.

20     County Defendants also move to strike several statements allegedly made by

21 Jefferson County deputies to Mr. Brees. Dkt. 40 at 3. Such statements appear to have

22 been made by Defendants' "agent or servant concerning a matter within the scope of the

23 agency or employment, [] during the existence of the relationship" and should not be

24 stricken. *See* Fed. R. Evid. 801(d)(2)(D).

25     County Defendants also seek to strike several statements as speculative and not

26 supported by personal knowledge. The response's statement about Joyce Arthur

27 "apparently" calling 911 to prevent Mr. Brees from making a complaint about Mr. Thayer

28

is not supported by personal knowledge and is stricken. The statements that Mr. Thayer

lied to Jefferson County deputies, that Mr. Thayer sent emails to himself, and that Deputy

Post asked Mr. Thayer and Ms. Arthur to send emails to themselves are not supported by

the deposition cited in the response and are therefore considered legal argument rather

than statements of fact.

Finally, County Defendants move to strike Exhibit C to the Declaration of Randy

Loun. Dkt. 40 at 4. This exhibit consists of handwritten statements. Two of the statements

appear to be signed, and one does not. *See* Dkt. 39-4, Exh. C. At best, these statements are

neither sworn nor notarized. In addition, these statements detail the alleged harassment of

someone who is not a party to this suit. For purposes of the summary judgment motion,

this exhibit is stricken.

**C.    42 U.S.C. § 1983 CLAIMS**

Section 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or other
> person within the jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws, shall be
> liable to the party injured in an action at law, suit in equity, or other proper
> proceeding for redress . . . .

42 U.S.C. § 1983. Section 1983 is the procedural device for enforcing substantive rights

provisions of the Constitution and federal statutes. *Crumpton v. Gates*, 947 F.2d 1418,

1420 (9th Cir. 1991). Section 1983 plaintiffs must allege an independent substantive basis

for relief. *Id.* The elements of a Section 1983 claim are (1) a violation of rights protected

by the Constitution or by federal statute, (2) proximately caused (3) by conduct of a

"person" (4) acting under color of state law. *Id.*

**1.    Access to Courts and Freedom of Speech**

Mr. Brees contends that Defendants violated his right to access the courts "[b]y

harassing and intimidating [him] due to a past law suit." Dkt. 11 at 6. In other words, Mr.

Brees contends that he was retaliated against for exercising his right to access the courts.

1   This claim is similar to Mr. Brees's contention that he was retaliated against for

2   exercising his right to freedom of speech when he distributed a petition regarding

3   oversight of the Jefferson County Sheriff's Office and sought election to the Jefferson

4   County Sheriff's Office. *See* Dkt. 11 at 6; Dkt. 38 at 9-11 (combined response on access

5   to courts and freedom of speech claims); *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d

6   1310, 1314 (9th Cir. 1989) (applying a "similar analysis" to claims of retaliation for

7   exercising rights of speech and access to courts).

8          The constitutional right of access to the courts is essentially "the right to pass

9   through the courthouse doors and present one's claim for judicial determination." *Los*

10  *Angeles County Bar Ass'n v. Eu*, 979 F.2d 697, 706 (9th Cir. 1992). The right of access to

11  the courts has several components. *Id.* at 705. First, the Supreme Court has recognized

12  that the right to sue and defend is constitutionally protected as one of the "privileges and

13  immunities of citizenship that may not be denied by one state to citizens of another." *Id.*;

14  *Chambers v. Baltimore & O.R. Co.*, 207 U.S. 142, 148 (1907). Second, the Supreme

15  Court has recognized that the Due Process Clause of the Fourteenth Amendment includes

16  the right of access to the courts to vindicate fundamental rights that would otherwise be

17  unprotected. *Los Angeles County Bar Ass'n*, 979 F.2d at 705. Third, the Supreme Court

18  has recognized that prisoners have a fundamental constitutional right of access to the

19  courts stemming from both the First Amendment's right to petition the government and

20  from the Due Process Clause. *Id.* Finally, there is a right to access the courts stemming

21  form the First Amendment right to petition the government. *Id.* at 706.

22         Deliberate retaliation against the exercise of an individual's right to access the

23  courts or freedom of speech is actionable under Section 1983. *Hartman v. Moore,* 547

24  U.S. 250, 256 (2006) ("[T]he First Amendment prohibits government officials from

25  subjecting an individual to retaliatory actions, including criminal prosecutions, for

26  speaking out."); *Soranno's Gasco, Inc.*, 874 F.2d at 1314. Such claims require evidence

27  that (1) Defendants possessed an impermissible motive to interfere with Plaintiff's First

28

1    Amendment rights, (2) that the offending conduct would chill a plaintiff of ordinary

2    firmness from engaging in future First Amendment activities, and (3) that Defendants

3    would not have engaged in the conduct but for the retaliatory motive. *See Mendocino*

4    *Environmental Center v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999);

5    *Hartman*, 547 U.S. at 260.

6           If Plaintiff succeeds in establishing a prima facie case of retaliation, the burden

7    shifts to Defendants to demonstrate that the action complained of would have been taken

8    even without the exercise of First Amendment rights. *See Hartman*, 547 U.S. at 260

9    ("action colored by some degree of bad motive does not amount to a constitutional tort if

10   that action would have been taken anyway"). The intent to inhibit speech can be

11   demonstrated through direct or circumstantial evidence. *Mendocino*, 192 F.3d at 1301-02.

12          In this case, Mr. Brees asserts that he was prosecuted and subjected to harassment

13   in retaliation for exercising his constitutional rights. County Defendants move for

14   summary judgment on these claims because Mr. Brees's allegations, if true, do not rise to

15   the level of a constitutional violation and would not silence a person of ordinary firmness

16   from engaging in constitutional activities. Dkt. 32 at 10.

17          In seeking summary judgment, County Defendants contend that this case is

18   analogous to *Carroll v. Pfeffer*, 262 F.3d 847 (8th Cir. 2001). As explained below, the

19   Court disagrees. In *Carroll*, the Eighth Circuit upheld summary judgment in favor of a

20   police officer who allegedly retaliated against the plaintiff for exercising First

21   Amendment rights. *Carroll*, 262 F.3d at 850. The *Carroll* officer approached the

22   plaintiff's vehicle while stopped at an intersection and attempted to open the car door,

23   bumped into the plaintiff in a store, shouted at the plaintiff while shaking his fist, glared

24   at and taunted the plaintiff, and nearly ran into the plaintiff with his car. *Id.* at 849. The

25   Eighth Circuit held that the incidents, though unprofessional and inappropriate, did not

26   rise to the level of a constitutional violation and were too few and far between to chill the

27   First Amendment activities of an ordinary person. *Id.* at 850. The court noted that the

28

1   conduct had occurred over a period of three years, with some incidents separated by a

2   period of two years. *Id.*

3          In this case, the precise timeline of the events is not entirely clear. A jury could

4   conclude that one or more of the following would deter a person of ordinary firmness

5   from continuing to engage in First Amendment activities: the deputies' arrest of Mr.

6   Brees without allowing Mr. Brees to recite his version of the events occurring on March

7   16, 2006, the use of weapons to execute the search warrant on August 19, 2006, grabbing

8   and dragging Mr. Brees to remove him from his home while the house was searched,

9   using forced entry to execute the search warrant, threatening to take Mr. Brees to jail for

10  reckless driving, unsnapping a gun while citing Mr. Brees for running a stop sign, and

11  following Mr. Brees down his driveway.

12         County Defendants also contend that summary judgment on these claims is proper

13  because Plaintiff cannot demonstrate that chilling Mr. Brees's speech was a motivating

14  factor behind the conduct alleged. Dkt. 32 at 12. Mr. Brees's allegations about Deputy

15  Post identifying him as having sued Jefferson County in the past and statements made in

16  the presence of April Brees are sufficient to raise a genuine issue of material fact as to

17  whether deputies were angry about Mr. Brees's previous activities and therefore sought to

18  punish Mr. Brees for such activities. Summary judgment on Mr. Brees's First

19  Amendment claims is therefore denied.

20         **2.      Illegal Search and Seizure**

21         The Fourth Amendment provides, "The right of the people to be secure in their

22  persons, houses, papers, and effects, against unreasonable searches and seizures, shall not

23  be violated . . . ." U.S. Const. amend. IV. In this case, Mr. Brees asserts that Defendants

24  violated his constitutional rights by arresting him without probable cause and searching

25  his house and seizing his computers on the basis of an invalid search warrant.

26

27

28

1

        (a)    **Arrest**

2        The "principal inquiry" in determining the lawfulness of an arrest is whether the

3   arrest was supported by probable cause. *Rodis v. City and County of San Francisco*, 499

4   F.3d 1094, 1098 (9th Cir. 2007). Probable cause exists if the facts and circumstances the

5   officer knew at the time are sufficient to warrant a prudent person, or one of reasonable

6   caution, to believe that, in light of the circumstances, the suspect has committed, is

7   committing, or is about to commit an offense. *U.S. v. Greene*, 783 F.2d 1364, 1367 (9th

8   Cir. 1986).

9        In this case, Mr. Brees was arrested for assault and malicious mischief. Fourth

10  degree assault is defined as assault of another under circumstances not amounting to

11  assault in the first, second, or third degree, or custodial assault. RCW 9A.36.041. Third

12  degree malicious mischief is defined as "[k]nowingly and maliciously caus[ing] physical

13  damage to the property of another, under circumstances not amounting to malicious

14  mischief in the first or second degree." RCW 9A.48.090.

15       In his response, Mr. Brees contends that probable cause was lacking because the

16  deputies did not fully investigate the incident before placing Mr. Brees under arrest. *See,*

17  *e.g.*, Dkt. 39-5, Exh. D at 10 ("You know, they wouldn't let him say anything to be honest

18  with you. They - - I mean, he was trying to tell his side of the story, but they were like - -

19  you know, they weren't about to hear anything."). At the time of Mr. Brees's arrest,

20  Deputy Post had heard accounts of the event from Mr. Thayer and Mr. Brees. Ms. Brees

21  declined to speak with the deputies. In addition, Deputy Post contends that Mr. Brees was

22  angry and uncooperative when questioned by the police, and Mr. Brees does not

23  contradict this characterization. Deputy Post also observed acceleration marks on the

24  ground, corroborating Mr. Thayer's contention that Mr. Brees drove away at a rapid

25  speed after threatening to hit him with the pipe. Dkt. 41, Exh. 1 at 7. Deputy Post also

26  observed the pipe. *Id.*

27

28

1    Mr. Brees disputes whether he removed the pipe from the ground or used it to

2 threaten Mr. Thayer or strike the gate. Dkt. 39-2, Exh. A at 34. There is no dispute that

3 Mr. Brees ended his conversation with the deputies by saying, "fine" and turning to go

4 back inside of his house. *Id.* at 42; Dkt. 41, Exh. 1 at 11. Mr. Brees contends that he did

5 so because the deputies were not listening to his side of the story. Mr. and Ms. Brees's

6 contention that the deputies were laughing at Mr. Brees and refusing to listen to his

7 version of events is sufficient to create a genuine issue of material fact as to whether the

8 facts known to Deputy Post at the time of the arrest would lead a reasonable person to

9 conclude that Mr. Brees had committed malicious mischief in the third degree and assault

10 in the fourth degree. Summary judgment on Plaintiff's unlawful arrest claim is therefore

11 denied.

12                              **(b)    Search Warrant**

13    To prove that a warrant is unlawful, Section 1983 plaintiffs must demonstrate that

14 the officer "made deliberately false statements or recklessly disregarded the truth in the

15 affidavit" supporting the search warrant and "that the falsifications were 'material' to the

16 finding of probable cause." *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1126 (9th

17 Cir. 2002).

18    In this case, the Brees residence was searched pursuant to a warrant issued by

19 Commissioner Pro Tem Shaneyfelt. Dkt. 33, Exh. 2 at 15. The warrant is accompanied by

20 an affidavit from Deputy Post. *Id.* The affidavit seeks a search warrant authoring the

21 seizure of evidence of the crimes of intimidating a witness or harassment. *Id.* Intimidating

22 a witness is defined, in part, as follows:

23          (1) A person is guilty of intimidating a witness if a person, by use of a
       threat against a current or prospective witness, attempts to:
24          (a) Influence the testimony of that person;
            (b) Induce that person to elude legal process summoning him or her to
25     testify; [or]
            (c) Induce that person to absent himself or herself from such
26     proceedings

27

28

1   RCW 9A.72.110(1). In this context, "threats" includes acts intended to substantially harm

2   another with respect to his or her financial condition. RCW 9A.72.110(3)(a)(ii); RCW

3   9A.04.110(27)(j). When a defendant is charged with a crime involving harassment, the

4   court may order the defendant to have no contact with the victims of the alleged crime

5   involving harassment. RCW 9A.46.040(2); RCW 9A.46.060(8)(19) (assault in the fourth

6   degree and malicious mischief in the third degree are crimes involving harassment).

7   Violation of such an order is a criminal offense. RCW 9A.46.040(2).

8        Deputy Post's affidavit states that Mr. Brees was ordered to have no contact with

9   Mr. Thayer as a condition of his release pending trial, that Mr. Thayer was listed as a

10   witness in Mr. Brees's criminal trial, and that Mr. Thayer was "alarmed" and

11   "intimidated" by the emails and believed they were related to Mr. Brees's criminal trial.

12   Dkt. 33, Exh. 2 at 15-16. The affidavit further states that Mr. Thayer received two emails

13   on August 18, 2006, from the email address "info@assistusellrealty.com" and signed

14   "Richard Brees." *Id.* at 15. The affidavit contains the text of these emails. *Id.* at 15-16.

15   The text of the email includes statements that the author of the emails is going to sue Mr.

16   Thayer and expose Mr. Thayer as "a fake" with respect to his social security status. *Id.* at

17   16. The affidavit states that Mr. Brees is a realtor and that the website from which the

18   emails were apparently sent appears to be a realty website. *Id.* The warrant authorizes the

19   search of personal computer hardware, software, and data and seizure of data pertaining

20   to emails sent to Mr. Thayer's email account. Dkt. 33, Exh. 4 at 37.

21        While Mr. Brees contends that Deputy Post may have collaborated with Mr.

22   Thayer and Ms. Arthur to create fictitious emails, Mr. Brees offers no evidence to support

23   this supposition beyond his assertion that Deputy Post was "out to get" Mr. Brees. Dkt. 38

24   at 14. Such an allegation, even coupled with Deputy Post's omission of the recipient

25   email address from the affidavit, is insufficient to create a genuine issue of material fact,

26   and summary judgment on Mr. Brees's Fourth Amendment claim for illegal search is

27   therefore proper.

28

### 3.     Malicious Prosecution and False Imprisonment

County Defendants contend that summary judgment on Mr. Brees's malicious prosecution claim is proper because his prosecution was supported by probable cause, there is no evidence that the prosecution was instituted or continued out of malice, and Mr. Brees did not suffer any damage as a result of the prosecution. Dkt. 32 at 16. Similarly, County Defendants contend that summary judgment on Plaintiff's false imprisonment claim is proper because probable cause is a complete defense to claims of false imprisonment. *See McBride v. Walla Walla County*, 95 Wn. App. 33, 38 (1999).

A claim for malicious prosecution requires evidence that (1) Defendants initiated or continued a principal action; (2) Defendants acted without probable cause; (3) Defendants instituted or continued the prosecution with malice; (4) the principal action terminated in favor of Plaintiff or was terminated; and (5) Plaintiff suffered damage as a result of the malicious prosecution. *Clark v. Baines*, 150 Wn.2d 905, 911 (2004). Plaintiff may demonstrate malice with evidence that Defendants instituted the criminal proceedings against him without believing him to be guilty, primarily because of hostility or ill will, for the purpose of obtaining a private advantage against him, for wrongful or improper motives, or in reckless disregard for Plaintiff's rights. *Turngren v. King County*, 104 Wn.2d 293, 306 (1985); *Peasley v. Puget Sound Tug & Barge Co.*, 13 Wn.2d 485, 502 (1942). Probable cause is an absolute defense to a malicious prosecution claim. *Clark*, 150 Wn.2d at 912. In this context, probable cause is defined as "reasonable ground for suspicion, supported by circumstances sufficiently strong in themselves to warrant an ordinarily prudent and cautious man in believing the accused guilty of the offense with which he is charged." *Peasley*, 13 Wn.2d at 508.

False imprisonment is "the unlawful violation of a person's right of personal liberty or the restraint of that person without legal authority." *Bender v. City of Seattle*, 99 Wn.2d 582, 591 (1983).

1  As explained above, there are genuine issues of material fact as to whether Deputy
2  Post had probable cause to arrest Mr. Brees. Taking the allegations in the light most
3  favorable to Plaintiff, Deputy Post arrested Mr. Brees without hearing Mr. Brees's
4  account of the incident or of the mark above his eye as punishment for Mr. Brees's
5  previous lawsuit against Jefferson County.

6  As noted by County Defendants, Mr. Brees fails to allege any damages incurred as
7  a result of the arrest and prosecution. Dkt. 32 at 16; Dkt. 41, Exh. 2 at 35 (Plaintiff has not
8  seen a mental health therapist for alleged emotional distress.). While it is unclear whether
9  Plaintiff will be able to establish damages incurred as a result of his imprisonment and
10 prosecution, the Court cannot rule as a matter of law that no such damages were incurred.
11 Summary judgment as to Plaintiff's malicious prosecution and false imprisonment claims
12 is therefore denied.

### IV. ORDER

Therefore, it is hereby

**ORDERED** that County Defendants' Motion for Summary Judgment (Dkt. 32) is **GRANTED in part** and **DENIED in part** as follows: The motion is **GRANTED** as to Plaintiff's illegal search claim, and that claim is **DISMISSED**. The motion is otherwise **DENIED**.

DATED this 24th day of January, 2008.

BENJAMIN H. SETTLE
United States District Judge

ORDER - 18